# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-2297V

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
|  |  |  |
|---|---|---|
|  | \* |  |
| CYNTHIA CEVORA, | \* | Chief Special Master Corcoran |
|  | \* |  |
| Petitioner, | \* | Filed:  June 5, 2026 |
|  | \* |  |
| v. | \* |  |
|  | \* |  |
| SECRETARY OF HEALTH AND | \* |  |
| HUMAN SERVICES, | \* |  |
|  | \* |  |
| Respondent. | \* |  |
|  | \* |  |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Ronald C. Homer,* Conway Homer P.C., Boston, MA, for Petitioner

*Dorian Hurley,* U.S. Department of Justice, Washington, DC, for Respondent.

## ENTITLEMENT DECISION[1]

On December 16, 2021, Cynthia Cevora filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petition (ECF No. 1) ("Pet."). Petitioner alleges that she suffered from transverse myelitis ("TM") as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine she received on March 18, 2019.

A one-day entitlement hearing was held in Washington, D.C., on June 5, 2025, and the parties subsequently filed post-hearing briefs. Petitioner's Brief, dated Sept. 19, 2025 (ECF No. 82) ("Br."); Respondent's Opposition Brief, dated Sept. 19, 2025 (ECF No. 83) ("Opp."). Now, based upon my review of the record and consideration of the hearing testimony, I deny entitlement.

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

The record does not preponderantly support the conclusion that Petitioner likely experienced TM, or that the Tdap vaccine could cause it.

## I.        Fact Summary

*Pre-Vaccination History*

Ms. Cevora's medical history includes ulcerative colitis, irritable bowel syndrome, esophageal dysmotility, gastroesophageal reflux disease, and restless leg syndrome ("RLS"). *See, e.g.*, Ex. 2 at 48; Ex. 6 at 7. Her GI-associated health issues negatively affected her work capacity, and she struggled with treatment of her RLS. Ex. 2 at 67, 69, 163, 165; Ex. 6 at 7. The very same month as her vaccination, she reported worsening of her RLS, and it was recommended that she see a neurologist. Ex. 2 at 165, 169, 172.

*Vaccination and Subsequent Hospitalization*

On March 18, 2019, Petitioner saw Dr. Wendy Alband, her primary care physician ("PCP"), and reported bilateral leg pain and "jumping," plus the fact that her "arm [wa]s also bothering her." Ex. 2 at 174–75. Dr. Alband noted that Petitioner's leg symptoms were "a chronic problem" (consistent with her prior RLS diagnosis) which had been resistant to pharmaceutical treatment. *Id*. at 175. She was again referred to a neurologist, and at this time received the Tdap vaccine at issue. Ex. 1 at 4; Ex. 2 at 177–79, 201. There is no record evidence of any immediate vaccine reaction.

Nearly two weeks later (March 31, 2019), Petitioner went to an urgent care treatment facility reporting a two-day history of a red, raised, weeping rash on both arms and legs after helping her sister do yardwork. Ex. 5 at 12. She was diagnosed with poison ivy dermatitis and prescribed a five-day course of prednisone. *Id*. at 14.

The following day (April 1, 2019), Petitioner took herself to the DePaul Medical Center ("DMC") Emergency Department ("ED") with renewed complaints of right leg weakness and numbness after waking up in the middle of the night, when she noticed that "her right leg was weak and that she was unable to bear weight on it." Ex. 3 at 96. She informed the attending physician that she had "chronic [RLS]" that had "been worsening recently," and that the day prior she noticed "that her right leg was more jumpy" than normal, and that she had experienced headaches (plus GI problems she believed were attributable to the medication she was taking for the poison ivy exposure). *Id*. She further reported new right lumbar back pain. *Id.*

Neurologist Michael Katsnelson, M.D., characterized Petitioner's condition as "[r]ight leg weakness with variable effort—conversion [versus rule out] spine pathology." Ex. 3. at 351. He

listed a primary diagnosis of "[a]nxiety/[p]sychogenic/[f]actitious," but noted under differential diagnosis the need to rule out a spine pathology—and to that end recommended hospital admission, a lumbar spine MRI, physical and occupational therapy ("PT" and "OT"), and neurology follow-up. *Id*. Later that day, Petitioner saw another neurologist (Anne Redding, M.D.). Dr. Redding noted that Ms. Cevora suffered from treatment-resistant RLS, and had no current illnesses (other than her recent poison ivy exposure). *Id.* at 146. Petitioner had reported new-onset right leg weakness over the past day or two along with abrupt leg jerking and "decreased sensation in the right lower abdomen and fullness." *Id*. Examination revealed "spastic weakness in the right leg" and "right T7-10 sensory level, less in the sacral distribution." *Id*. at 147.

A number of MRIs were performed at this time. A lumbar spine MRI performed that day showed very mild L4-5 disc bulge with small superimposed central disc protrusion and mild lower lumbar spine facet arthropathy, which Dr. Redding deemed "unrevealing." Ex. 3. at 146, 214–15. A thoracic spine MRI's results were also considered unremarkable, and showed "[n]o abnormality to suggest etiology of myelopathy." *Id*. at 215–16. A cervical spine MRI showed "[n]o intrinsic cord lesion or significant canal stenosis to account for myelopathy," and "[d]egenerative spondylosis most pronounced C4/5 and C5/6 with mild degenerative endplate marrow edema, without significant stenosis." *Id*. at 216–17. And a brain MRI revealed a "[l]obulated pineal cyst or multiple pineal cysts with mild distortion of the superior colliculus but no hydrocephalus." *Id*. at 119. Based on exam plus the imaging results, Dr. Redding's assessment was "myelopathy of uncertain duration, but worse in the past 24-48 hours with significant weakness." *Id*. at 146. She planned to evaluate Petitioner "for compressive etiology first [and] then possible inflammatory etiologies." *Id*.

By the next day (April 2, 2019), Petitioner's right leg weakness had improved, and her leg was more capable of movement. Ex. 3 at 133, 138. Dr. Redding now listed Petitioner's problems as right leg weakness and RLS. *Id*. at 133. Cerebral spinal fluid ("CSF") testing revealed elevated protein levels (59 mg/dL; reference range 15-45 mg/dL), but white blood cell counts were within normal limits, and Petitioner's immunoglobulin ("IgG") index was normal. *Id*. at 137, 202. Thus, at this stage of Petitioner's treatment, and after onset of the neurologic-like symptoms that compelled her to seek medical care, direct CSF testing largely did not yield particularly confirmatory proof of spinal cord inflammation (nor had imaging). Petitioner was nevertheless started on IV steroids. *Id.* at 232.

Dr. Redding noted Petitioner's continued leg weakness improvement and normal CSF cytology, but abnormal levels of vitamin D and CSF protein. Ex. 3 at 115. A neurological examination revealed "Brown-Sequard[3] findings . . . with vibration and position sense affected on

---

[3] "Brown-Séquard syndrome" is defined as "a syndrome due to damage of one half of the spinal cord, resulting in ipsilateral paralysis and loss of discriminatory and joint sensation, and contralateral loss of pain and temperature sensation." *Brown-Séquard syndrome*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=110337 (last visited June 5, 2026).

the right and temperature on the left." *Id*. at 116. But a follow-up MRI of Petitioner's thoracic spine performed on April 4, 2019, revealed "[n]o abnormal thoracic cord enhancement . . . to suggest acute demyelinating lesion," and "[n]o high-grade central or foraminal stenosis" or "focal disc herniation." *Id.* at 219–20. And a cervical spine MRI revealed "[n]o abnormal cervical cord enhancement . . . to suggest acute demyelinating lesion," and "[v]ery mild mid cervical spine degenerative changes without high-grade central stenosis." *Id.* at 220–21.

Because Petitioner expressed an interest in ending her hospitalization, Dr. Redding proposed that Petitioner visit neurologist Ingrid Loma-Miller, M.D., on an out-patient basis for administration of a third dose of IV steroids. Ex. 3 at 115. Petitioner was discharged April 4th, and the discharge summary noted that she had presented with "worsening weakness involving her right leg" thought to be "associated with paresthesia involving her lower abdomen and pelvic," but that "MRI testing of her head and spine showed no evidence for stroke or spinal cord injury." Petitioner wad nevertheless diagnosed with "acute [TM]," with symptoms improvement after starting IV steroids. *Id.*

### *Post-Hospitalization Treatment: April – December 2019*

Petitioner received three additional doses of IV steroids as an outpatient (on April 4, 5, and 8, 2019). Ex. 7 at 42–47. She reported improvement in her right leg symptoms, although she felt like her bladder was not fully emptying. *Id.* at 42, 44. On April 9, 2019, she saw Dr. Loma-Miller for an assessment of possible multiple sclerosis ("MS"). Ex. 7 at 36. Dr. Loma-Miller took note of Petitioner's history, as well as the fact that her symptoms "did not seem to improve much" after steroids, and that she continued to experience right lower extremity weakness, numbness, and some lower limb jerking. *Id.*

Dr. Loma-Miller's examination revealed a decreased response to pain and temperature stimulation that was patchy in both legs, decreased response to stimulation by vibration in both legs and feet, right lower extremity weakness observed against resistance, and abnormal walking on the right side. Ex.7 at 39. Dr. Loma-Miller also observed that the prior brain MRI performed on Petitioner revealed no white matter lesions, and that her spine MRIs showed no cord lesions. *Id.* at 40. Dr. Loma-Miller subsequently deemed Petitioner not to meet commonly-accepted medical criteria for MS. *Id.*

In mid-April 2019, Petitioner began physical therapy ("PT"), undergoing three sessions that month. Ex. 14 at 6–7. At her April 24, 2019 session, Petitioner "brought a video" of her "legs jumping," and commented that she "realized they have been jumping like that since 2017." *Id.* at 2. She had "significant improvement in gait," but continued to experience numbness on the right side of her trunk and in her legs "despite having negative neuro[logical] testing." *Id.*

4

Toward the end of April, Petitioner had an urgent care visit complaining of painful urination and incomplete bladder emptying, but was diagnosed only with a urinary tract infection (despite her prior neurologic issue). Ex. 5 at 19, 21. She then saw an oncologist in May for evaluation of a family history of breast cancer. Ex. 12 at 2. At this time, she reported a "history of several weeks of numbness over the right lower extremity and right side of the trunk," and that she had weakness in her right leg and abnormal gait, for which she was seeing neurologists. *Id*. The oncologist gleaned from her history chart that she had a "presumptive history of [TM]," but that she "report[ed] that she ha[d] [MS]." *Id.*

Ms. Cevora later saw Dr. Redding again in mid-May, reporting that she continued to experience tingling, numbness, and difficulty walking and using her right leg, plus some new sleep concerns (perhaps related to her RLS), and she was told she might be a candidate for a sleep study. Ex. 7 at 32–34. And in late July Petitioner had a urology consult with Dr. William Rawls due to recurrent UTIs, and the possibility of neurogenic bladder (given her prior TM-like experience) was raised. Ex. 8 at 12–13.

On August 19, 2019, Petitioner went back to Dr. Loma-Miller with complaints that she was still not back to baseline since her April 2019 hospitalization (although she could walk better), and was experiencing weakness, muscle spasms, and urinary issues, among other things. Ex. 7 at 26. Dr. Loma-Miller noted that Petitioner still did not meet the "McDonald criteria for [MS]," and discussed EMG[4]/NCS[5] testing since Petitioner "complain[ed] of paresthesias and weakness and prior MRI studies were normal." *Id*. at 30. Petitioner that same month underwent EMG/NCS studies of her legs, but the results were deemed to fall "within normal limits," and showed "no electrodiagnostic evidence of lumbar radiculopathy or generalized peripheral neuropathy," although a small fiber neuropathy ("SFN") could "not be excluded." Ex. 17 at 2. And on September 26, 2019, Petitioner followed up with Dr. Rawls for difficulty voiding due to "[n]eurogenic bladder" and recurrent UTIs. Ex. 8 at 23.[6]

---

[4] "Electromyography" is defined as "an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation; performed using any of a variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals." *Electromyography*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15854&searchterm=electromyography (last visited June 5, 2026).

[5] A "Nerve Conduction Study" is defined as "a diagnostic test that evaluates the function of [the] peripheral nerves. An NCS can help detect the presence and extent of peripheral nerve damage." *Borgelt v. Sec'y of Health & Hum. Servs.*, No. 23-1051V, 2026 WL 267899, at n.3 (Fed. Cl. Spec. Mstr. Jan. 5, 2026).

[6] Petitioner continued over the next several years to follow up with Dr. Rawls for her urologic concerns. *See, e.g.*, Ex. 36 at 11 (February 15, 2021), 18–24 (November 23, 2021); Ex. 61 at 87 (April 19, 2023), 20 (September 27, 2023); Ex. 84 at 24–25 (April 23, 2024), 13–14 (July 29, 2024).

Follow-up MRIs were performed in October 2019. The brain MRI revealed "[n]o evidence of acute or other significant brain finding, no abnormality to suggest area of demyelination," "[n]o significant interval change," and "[s]table coalescent thin-walled likely benign pineal cysts with stable mild deformity superior colliculus, without hydrocephalus." Ex. 3 at 371. A cervical spine MRI revealed "[n]o intrinsic cord lesion to suggest [an] area of demyelination," "[s]table degenerative spondylosis most pronounced C5/6, with mild canal stenosis and slight cord flattening at this level," and "[n]o significant interval change." *Id*. at 407. A lumbar spine MRI revealed "[m]ild degenerative changes, most pronounced at L4-5 where there [was] a small, broad-based central disc protrusion which [was] unchanged," but was "[o]therwise, unremarkable." *Id*. at 445. And a thoracic spine MRI revealed "[m]inimal degenerative changes without significant interval change," and was "[o]therwise, unremarkable" with "no imaging findings to suggest the sequela of previous or active demyelination." Id. at 425–26, 479. Thus, even if inflammatory etiologies had been suspected in April, six months later there was no further such evidence to be identified.

On October 14, 2019, Ms. Cevora had her annual exam with Dr. Alband, who noted that Petitioner reported "no complaints." Ex. 2 at 243. That same month she saw a neurologic nurse practitioner at Dr. Loma-Miller's office complaining of continued right lower extremity weakness and intermittent associated muscle spasms and paresthesias, as well as intermittent paresthesias in her upper extremities. Ex. 7 at 20. But it was noted that Petitioner did not meet the accepted diagnostic criteria for MS, and that her EMG testing had been normal. *Id.* at 24. That same fall, Petitioner saw other kinds of specialists for unrelated treatment, informing them that she "ha[d] Brown Sequard and [TM], believed to be due to active virus from a Tdap vaccine," but stated that "it [wa]s not considered to be an autoimmune response, [but] rather sequelae of the virus itself." Ex. 4 at 8.

In December 2019, Petitioner again saw the nurse practitioner at Dr. Loma-Miller's practice for evaluation of ongoing right lower extremity weakness and paresthesias. Ex. 7 at 14. She also reported urologic issues, and expressed concern that stress she felt could exacerbate her symptoms. *Id*. She also restarted PT, again informing care providers that she had "Brown-Sequard syndrome" and TM, which she stated "comes from a virus," that "they think it may have been from a TDAP shot," and that symptoms could flare due to stress. Ex. 10 at 3.

*Treatment in 2020*

There is ample evidence in the period beginning nine-plus months after Petitioner's vaccination (and running to the present) that Petitioner obtained treatment associated with symptoms comparable to what she experienced closer in time to vaccination, although these records largely do not shed light on the issues of diagnosis or causation at issue. At most, Petitioner *informed* a variety of treaters that she had experienced Tdap vaccine-caused TM. *See, e.g.*, Ex. 9

at 10–11 (initial meeting in February 2020 with new PCP provider); Ex. 13 at 61, 63 (July 2020 PT evaluation); Ex. 23 at 27–28 (July 2020 neurology consultation); Ex. 20 at 9 (September 2020 visit to physiatrist). Petitioner also was treated for potential thrombotic conditions impacting her legs and foot, and which were at times speculated to be associated in some respect with her alleged TM. *See, e.g.*, Ex. 3 at 608, 631, and Ex. 9 at 22–24 (February 2020 treatment for deep vein thrombosis); Ex. 26 at 9–10 (May 2020 vascular specialist). Overall, it appears that TM was often considered to be associated with these ongoing symptoms, and yet the link was never truly endorsed or established.

Petitioner continued in this timeframe to seek treatment from neurologic specialists for issues that she suspected were neurologic and/or related to her April 2019 experience. In March 2020, she informed the neurologic nurse practitioner she had been seeing that she was "still not back to baseline," with right leg spasms and right foot issues. Ex. 7 at 8–13. She also that month saw her PCP and complained of "on [and] off" chronic right foot pain since her TM diagnosis, along with paresthesias. Ex. 9 at 8. It was proposed that these issues might be vascular in nature, and Petitioner saw appropriate specialists. Ex. 26 at 9–10. But no actual vascular issues were identified, and it was proposed Petitioner's concerns were neurologic in nature. *Id*. at 11. She also sought PT assistance due to foot dragging and numbness issues, pursuing it through November of that year. Ex. 13 at 61, 63.

During a June 18, 2020 telemedicine visit with Dr. Loma-Miller, Ms. Cevora reported that she had noticed increased weakness in her right leg since having a mastectomy in March, and complained of associated numbness from her left chest down to her foot plus worsening lower extremity weakness. Ex. 15 at 20, 23. It was also noted that although Petitioner had previously received a TM diagnosis, MRI findings had not confirmed spinal cord issues. But Dr. Loma-Miller determined that "[d]ue to [Petitioner] complaining of worsening symptoms," new MRI studies were warranted. Id.

In July 2020, Petitioner consulted with neurologist Wylie Zhu, M.D., Ph.D., regarding TM as well as Brown-Séquard syndrome that she claimed to have been offered as a possible explanation for her symptoms. Ex. 23 at 27–28. Dr. Zhu noted that it appeared that she had been properly managed from a neurology standpoint regarding her symptoms and proper treatment for TM. *Id.* He also noted that he did not have any of Petitioner's imaging studies, and that he would like to review a new MRI of her thoracic spine to evaluate what imaging revealed about possible inflammation. *Id.*

On July 28, 2020, a repeat lumbar spine MRI was performed, but it showed "[n]o [magnetic resonance] evidence of [TM] on the visualized distal cord," "[s]table small non[-]impinging posterior disc protrusion with annular fissure L4/5," and "no overall significant change." Ex. 15 at 11–12. A repeat thoracic spine MRI was also "unremarkable" and revealed "no intrinsic cord

abnormality to suggest [TM]." Ex. 37 at 285. After reviewing this new imaging as well as results from both April and October 2019, Dr. Zhu deemed the spinal cord images to reveal "no evidence of cord lesion or compression." *Id.* at 20. He maintained the TM assessment, however, and ordered a follow-up brain MRI—performed in September 2020, and which revealed no acute findings. Ex. 37 at 213–14.

That fall, Petitioner continued to see the neurologic nurse practitioner. Ex. 15 at 14. She also initiated treatment with physiatrist Scott Horn, D.O., for left leg pain. Ex. 20 at 9. And in October she was evaluated for a new knee ankle foot orthosis. Ex. 21 at 5–6.

*Treatment in 2021 and Beyond*

In January 2021, Petitioner followed up with Dr. Zhu, who noted that the September 2020 brain MRI did not reveal any progressive issues. Ex. 23 at 7–8. He recommended another MRI in September 2021. *Id.* Petitioner also again saw her neurologic nurse practitioner about ongoing leg and occasional upper extremity weakness. Ex. 24 at 18. It was noted at this time that despite the prior TM impression, given the "ongoing myriad of symptoms" it was advisable for Petitioner to see a neuromuscular specialist. *Id.* at 22, 23. It was also reiterated that Petitioner's presentation was not consistent with the formal criteria for MS. *Id.* at 22. A repeat January 2021 MRI of Petitioner's cervical spine again revealed no abnormalities consistent with demyelination. Ex. 37 at 121–22.

On May 6, 2021, Petitioner was evaluated by neurologists Anton Ostashko, M.D., and Kelly Gwathmey, M.D., for her ongoing right lower extremity weakness. Ex. 25 at 6. Dr. Ostashko took into account Petitioner's history, including both her purported TM diagnosis and the possible vaccine association (as well as the overall ineffectiveness of steroids, given her ongoing symptoms). *Id.* at 7, 10. Dr. Ostashko also noted that her MRIs were "grossly unremarkable" and that the same was true of EMGs; that there was "no evidence of myelitis on contrasted studies"; that a lumbar puncture showed "very mild pleocytosis with protein of 59"; and that "cytology [was] negative." *Id.* at 6–7. Examination revealed effort-dependent strength testing in her right lower extremity and "[w]idely variable, inconsistent sensory testing" with "[n]o true sensory level" and "non-physiological patchy areas of sensory loss over her right lower back and right thigh that [did] not correspond to dermatome and sensory level." *Id.* at 10.

Based upon the foregoing, Dr. Ostashko opined that Petitioner's symptoms "likely stemm[ed] from remote spinal cord pathology," which would explain her "upper motor neuron findings." Ex. 25 at 10. Dr. Gwathmey opined that Petitioner did "not have a neuromuscular disorder," and that she most likely had an "atypical [TM]," and that a "spinal cord infarct" was "significantly less likely." *Id.* at 11. Both physicians referred Petitioner back to her primary neurologist. *Id.*

8

A June 9, 2021 EMG/NCV of Petitioner's right arm was within normal limits with "no electrodiagnostic evidence of carpal tunnel syndrome[,] cervical radiculopathy[,] or generalized peripheral neuropathy." Ex. 28 at 13. Petitioner saw Dr. Redding again in July 2021, at which time her stable condition was noted along with lingering right-side weakness that impacted Petitioner's gait. Ex. 28 at 8, 10.

Over the next three years, Petitioner was assessed for a number of conditions—sleep apnea, gastroparesis and other GI-associated concerns, urinary problems—in addition to her RLS and concerns thought associated with idiopathic TM, such as potential optic neuritis, neuromyelitis optica, and myelin oligodendrocyte glycoprotein associated disease. But repeat MRIs continued to reveal no changes or active concerns. *See, e.g.*, Ex. 34 at 12–13 (September 28, 2022 visit with Dr. Zhu); Ex. 38 at 53–56 (March 2023 neurologic evaluations and hospitalization); And while these treatment events repeatedly took into account Petitioner's purported April 2019 TM, they never connected her ongoing concerns to it. Petitioner did later require treatment associated with implantation of a baclofen pump (utilized for treatment of her ongoing muscle spasms and associated concerns), but this aspect of her medical history does not bear on the resolution of the case.

## II.    Witness Testimony

### A.    Petitioner's Expert – Dr. William Meador

Dr. Meador, a neurologist, offered three written reports and testified on behalf of Petitioner. *See* Report, dated May 17, 2023 (ECF No. 33-1) ("First Meador Rep."); Report, dated Nov. 24, 2023 (ECF No. 41-1) ("Supp. Meador Rep."); Report, dated May 14, 2024 (ECF No. 46-1) ("Second Supp. Rep."). Dr. Meador opined that Petitioner's TM "was subsequent to, and more likely than not, caused by her Tdap vaccine with a reasonable degree of medical certainty." First Meador Rep. at 8.

Dr. Meador attended Emory University for his undergraduate degree, and the University of Mississippi School of Medicine for his medical degree. Curriculum Vitae, filed as Ex. 40 (ECF No. 33-2) ("Meador CV"). He then completed an internship in Internal Medicine, a residency in Neurology, followed by a fellowship in neuroimmunology at the University of Alabama at Birmingham ("UAB"). Meador CV at 1. He is currently an Associate Professor of Neurology in the Division of Neuroimmunology at UAB and holds a few positions as a scientist and scholar with the Interprofessional Education Program and the Comprehensive Multiple Sclerosis Center at UAB. *Id.*; Tr. at 6. Dr. Meador also serves as Co-Director of the Transverse Myelitis Association Multidisciplinary Clinic at UAB. Meador CV at 4; First Meador Rep. at 2. He is board certified by the American Board of Psychiatry and Neurology in Adult Neurology. Tr. at 6. Dr. Meador

estimates that he treats approximately 100 patients per year with TM and other neurological disorders. First Meador Rep. at 2.

Dr. Meador began his testimony with a brief discussion of Petitioner's medical history prior to her receipt of the Tdap vaccine on March 18, 2019. He acknowledged that she had a documented history of gastroesophageal reflux disease, as well as a diagnosis of RLS that had been present for several years. Tr. at 11. He then recounted the events of March 31, 2019. Earlier that day, Petitioner presented to urgent care for issues unrelated to the claim herein, but later developed difficulty walking and right foot dragging; by 2:00 a.m. the next morning (April 1, 2019), she was no longer able to ambulate. *Id.* at 12. Upon her hospital admittance, Petitioner was evaluated by neurologist Dr. Redding, who assessed Petitioner with myelopathy of unknown duration, but which was thought to have worsened over the past 24 to 48 hours with significant weakness. *Id.* at 13. Petitioner's neurological examination was unremarkable, while her motor exam revealed spastic weakness in the right leg graded two out of five strength. *Id.* at 15. Petitioner remained hospitalized until April 4, 2019, during which time she underwent various testing (including an MRI and LP)—the results of which were not suggestive for TM—although, Dr. Meador noted that Petitioner's LP did reveal elevated protein and glucose levels with potential inflammation as the likely cause for elevation. *Id.* at 18.

Dr. Meador then provided an overview of Petitioner's treatment and clinical course following her initial hospitalization. Dr. Meador explained that Petitioner planned to continue IV Solu-Medrol treatment, PT to address her newly developed gait disorder and weakness, and to continue to follow-up with the neurology department for management of her spasticity and spasms. Tr. at 19. Throughout her treatment course in the ensuing years, Petitioner saw approximately five different neurologists—all of whom identified acute TM as her primary diagnosis. *Id.* at 26. Dr. Meador thus concluded that it was "clear that [Petitioner] suffered an event of [TM] that began on March 31st, 2019, and resulted in permanent weakness in her right leg and spasticity requiring a [B]aclofen pump, and also presenting as Brown-Sequard syndrome." *Id.* at 26–27.

TM, Dr. Meador explained, is known to involve autoimmune or inflammatory destruction/damage to the spinal cord. Tr. at 27. Relying on diagnostic criteria set forth in 2002, Dr. Meador noted that the process of elimination of other diseases is a substantial factor in diagnosing TM, as well as taking into account whether clinical symptoms are localized to the spinal cord. *Id.* at 27. Here, Petitioner's treating physicians adequately ruled out other causes via extensive testing, and her Brown-Sequard syndrome (which only localizes to the spinal cord) was documented by multiple physicians during her course of treatment. *Id.* Thus, Petitioner's case fell well within the diagnostic criteria for TM. Tr. at 27. Of note, Dr. Meador not only offered literature supporting the conclusion that TM can present as Brown-Sequard syndrome, but testified that he has seen it in his own professional experience. *Id.* at 29; *see also* X. Peng & L. Wang, *Idiopathic Myelitis Presenting as Brown-Sequard Syndrome: Two Case Reports and a Review of the Literature*, 15 J Med Case Rep 1 (2021), filed as Ex. 41 (ECF No. 33-3) ("Peng") (discussing two

10

cases of TM presenting as Brown-Sequard syndrome). In addition, Peng reviewed published case reports involving Brown-Sequard syndrome and myelitis, and listed diphtheria and tetanus vaccinations as a cause for one case, and the H1N1 vaccination as cause for a second case. Peng at 4, Table 1.

To explain Petitioner's unremarkable MRI findings, Dr. Meador relied on several items of literature. For example, Dr. Meador discussed an analysis by the Mayo Clinic which demonstrated that "10% of patients suffering from TM in [Neuromyelitis Optica Spectrum Disorder] have normal imaging." Tr. at 31–32; First Meador Rep. at 6 (referencing E. Sechi, et al., *Frequency and Characteristics of MRI-Negative Myelitis Associated with MOG Autoantibodies*, 27 Mult. Scler. 1, 3 (2021), filed as Ex. 58 (ECF No. 64-18)). Other articles also discussed MRI-negative TM, noting that "short lesions confined to the gray matter exist and can be difficult to identify, specifically for thoracic cord imaging which is often limited by high sensitivity to motion artifact and susceptibility differences at tissue interfaces." Tr. at 33; First Meador Rep. at 6–7 (citing G. Macaron & D. Ontaneda, *MOG-Related Disorders: A New Cause of Imaging-Negative Myelitis?*, 26 Mult Scler. 511, 512 (2020), filed as Ex. 59 (ECF No. 64-19) ("Macaron")). (It is not contended in this case, however, that Petitioner experienced MOGAD (myelin oligodendrocyte glycoprotein-associated disease), and there is no record evidence she ever tested positive for the MOG antibody (Ex. 38 at 130, 369)).

In addition, Dr. Meador noted that Petitioner's "spinal cord lesion occurred in the thoracic spine and therefore could easily go undetected by [the] thoracic spine MRI as noted [in Macaron]." First Meador Rep. at 7. He further articulated several additional reasons as to why imaging may not result in findings confirmatory of TM—the inflammatory lesions on the spinal cord are mild, for example, and therefore the blood-brain barrier may not have been breached; the imaging was conducted too early or too late; or the magnetic field was not sufficiently sensitive to identify lesions. Tr. at 36, 37; *see also* Y. Zhou, et al., *Comparison between MRI-Negative and Positive Results and the Predictors for a Poor Prognosis in Patients with Idiopathic Acute Transverse Myelitis*, 24 BMC Neurology 1, 9 (2024), filed as Ex. 90 (ECF No. 60-1).

Dr. Meador similarly attempted to explain away Petitioner's April 2, 2019 LP results. He accepted that the only abnormality revealed by this early CSF testing was her elevated protein levels. Tr. at 38. Although Drs. Callaghan and Fujinami suggested that it could be concluded from this that Petitioner's spinal fluid showed no evidence of inflammation (and therefore the results were inconsistent with TM), Dr. Meador countered that a Johns Hopkins study "looked at 247 consecutive, expert reviewed confirmed cases of inflammatory [TM] and found that only 57% of those patients had elevated [WBC] in their CSF." Tr. at 40; P. Barreras, et al., *Clinical Biomarkers Differentiate Myelitis from Vascular and Other Causes of Myelopathy*, 90 Neurology e12, e15, e17 (2018), filed as Ex. 74 (ECF No. 69-7). There was also the fact that steroids Petitioner had been prescribed could have altered the findings of these specific tests. *See generally* Tr. at 37–38; 41–42. Thus, this result did not rule out TM.

The expected outcome for individuals with TM, Dr. Meador maintained, was also a factor favoring the TM diagnosis given the evidence in this case. He contended that "approximately one third of patients ha[ve] a good outcome (either complete recovery or left with normal gait, mild urinary symptoms, and normal or minimally abnormal neurological signs), one third has a fair outcome (functional and ambulatory, but with varying degrees of spasticity, urgency and/or constipation, and some sensory signs) and one third has a poor outcome, i.e. remains completely or largely unable to walk, has at best partial sphincter control, and is left with severe sensory deficits." *Id.* at 43–44; A.T. Borchers & M.E. Gershwin, *Transverse Myelitis*, 11 Autoimmunity Revs. 231, 238 (2012), filed as Ex. 68 (ECF No. 41-3) ("Borchers"). Petitioner's clinical symptoms and course fit well within the category of those who experience a "fair outcome." Tr. at 44. In support, Dr. Meador referenced Petitioner's hospital admission in March 2023, at which time a physical examination by Dr. Basil revealed notable worsening in her lower extremity weakness compared to prior exams—ultimately leading Dr. Basil to believe Petitioner's symptoms were related to a functional neurologic disorder or a complicated migraine. *Id.* at 45; *see also* Ex. 38 at 100. Thus, Dr. Meador suggested that Petitioner's suspected complicated migraine likely led to an exacerbation of symptoms in her legs and right arm. Tr. at 47.

Since her initial neurologic event, Petitioner continues to experience lower right extremity weakness, as well as use catheters to aid her neurogenic bladder. But Dr. Meador emphasized that she has not been diagnosed with any other CNS demyelinating disorder, and her treating physicians continue to consider her case as one of acute TM that began on March 31, 2019. Tr. at 48.

As to causation, Dr. Meador opined that Petitioner's receipt of the Tdap vaccine likely caused her TM. Tr. at 48–49. He provided a general overview of vaccination and autoimmunity before discussing the specifics of a proposed mechanism by which the vaccine resulted in disease. *See generally* Tr. at 49–51; First Meador Rep. at 5. Two such mechanisms—molecular mimicry and bystander activation[7]—have been demonstrated in various animal models analyzing causes of CNS demyelination. *See* Y. Rodriguez, et al., *Guillain-Barre Syndrome, Transverse Myelitis and Infectious Diseases*, 15 Cell Mof. Immunol. 547, 557 (2018), filed as Ex. 70 (ECF No. 41-5) (stating that "[a]s in GBS, molecular mimicry has long been thought to play a primary role in triggering TM, [with] *C. jejuni* [being] one of the most important agents involved in this mechanism"); N. Agmon-Levin, *Transverse Myelitis and Vaccines: A Multi-Analysis*, 18 Lupus

---

[7] Molecular mimicry occurs when "foreign antigens presenting to the immune system would stimulate an immune attack not just against the antigen but against self-amino acid sequences homologous to the presenting antigen and known to be associated with a diseases process." *See Pek v. Sec'y of Health & Hum. Servs.*, No. 16-0736V, 2020 WL 1062959, at *4 (Fed. Cl. Spec. Mstr. Jan. 31, 2020).

Bystander activation occurs "when immune system cells that were previously suppressed, or anergic, are broken down by an existing/ongoing immune response to infection (or an autoimmune response to vaccination), causing immune tolerance created by those cells to similarly be destroyed and thereby allowing the dysregulation of the immune response to continue or expand." *Lozano v. Sec'y of Health & Hum. Servs.*, No. 15-369V, 2017 WL 3811124, at n.7 (Fed. Cl. Spec. Mstr. Aug. 4, 2017), *mot. for review den'd,* 143 Fed.Cl. 763 (2019), *aff'd*, 958 F.3d 1362 (Fed. Cir. 2020).

1198, 1201 (2009), filed as Ex. 42 (ECF No. 33-4) ("Agmon-Levin") (noting several mechanisms by which an infectious antigen may induce TM, and finding that bystander activation "may be associated with post-infectious TM as IL-6 levels were found to be markedly elevated in the CSF of TM patients). Another article discussed CNS demyelination following receipt of the COVID-19 vaccine, which Dr. Meador viewed as further support for bystander activation as a potential mechanism. Tr. at 57, 58 (discussing I. Ismail & S. Salama, *A Systemic Review of CNS demyelination following COVID-19 Vaccination*, 362 J. Neuroimmunology 1, CITE (2022), filed as Ex. 56 (ECF No. 33-18)).

Dr. Meador then briefly discussed a specific cytokine, interleukin 6 ("IL-6"), defining it as a "protein released to signal other immune cells" that serves as a "a key mediator in kind of the acute phase or the acute inflammation that occurs during an infection or during a vaccination." Tr. at 60. In response to Dr. Callaghan's assertion that molecular mimicry, bystander activation, epitope spreading, and IL-6 are not specific to TM or necessarily are likely triggered by vaccination, Dr. Meador countered that one study he had filed demonstrated a "direct, plausible, mechanistic connection between Tdap vaccination and TM events." Tr. at 60; Supp. Meador Rep. at 2–3; J. Gillard, et al., *BCG-Induced Trained Immunity Enhances Acellular Pertussis Vaccination Responses in an Explorative Randomized Clinical Trial*, 7 NPJ Vaccines 1, 1 (2022), filed as Ex. 69 (ECF No. 41-4) ("Gillard"). Gillard, he contended, "showed that improved overall response to vaccination with Tdap in [the] setting of prior BCG [Bacillus Calmette-Gurin] exposure was highly correlated with increased IL-6 production," and that the "study shows not only that IL-6 plays a role in the vaccine response, but it also shows that it correlates with the effectiveness of the vaccination, and that IL-6 is elevated after vaccination with Tdap, specifically." Supp. Meador Rep. at 3; Gillard at 1 ("showing that trained immunity that is induced by BCG vaccination 3 months prior to, but not concurrent with, a booster dose of Tdap-OPV, augments pertussis IgG response and modulates pertussis-specific cellular responses"); Tr. at 60.

Another study found "in rat models of EAE, a condition very similar to TM, that IL-6 is 'necessary and sufficient' to cause selective regional inflammation in the spinal cord," and that "there is a spatially distinct response to elevated IL-6 in the spinal cord of rats that does not occur in the brain." Second Supp. Meador Rep. at 3; A.I. Kaplin, et al., *IL-6 Induces Regionally Selective Spinal Cord Injury in Patients with the Neuroinflammatory Disorder Transverse Myelitis*, 115 J. Clinical Investigation 2731, 2731 (2002), filed as Ex. 76 (ECF No. 49-4). ("Kaplin"). Accordingly, Dr. Meador opined that "[t]his may be why TM, which is local inflammation in the spinal cord, is more likely to occur during IL-6 elevation from vaccines or infections than ADEM or other neuroinflammatory conditions." Second Supp. Rep. at 3. Indeed, the authors in Kaplin determined the "pathology in [the] IL-6-infused rats was similar to the axonal degeneration and demyelination seen in the spinal cord of a patient with severe, fatal TM." Kaplin at 2735.

Dr. Meador next maintained that Petitioner's TM began in a medically-acceptable timeframe, measured from the date of vaccination (March 18, 2019). Thirteen days later, on March 31, 2019, Petitioner developed right lower extremity heaviness, and then the next day she presented

to the ER for evaluation of difficulty walking and right lower extremity weakness. Tr. at 72. Dr. Meador deemed Petitioner's TM-related symptoms to have begun on March 31, 2019, when she developed heaviness of the right leg. *Id.* Literature, he maintained, supported the conclusion that production of immunoglobulins will typically develop within a week to ten days for a primary immune response, whereas with a secondary/adaptive response the process occurs within a few days and persist for several weeks thereafter. *Id.*; C.A. Siegrist, *Vaccine Immunology*, *in* Plotkin's Vaccines 16 (S.A. Plotkin, et al., eds. 20180), filed as Ex. 46 (ECF No. 64-7) ("Siegrist"). Thus, Petitioner's onset of neurological symptoms fell well within the appropriate timeframe for vaccine causation. Tr. at 74.

On cross-examination, Dr. Meador accepted that Petitioner's initial round of MRIs did not reveal any spinal cord lesions or inflammation consistent with TM. Tr. at 76. And he agreed that due to her continued symptoms of worsening lower extremity weakness, Petitioner's treating physicians were prompted to order another round of MRIs, but the results remained unremarkable. *Id.* at 80. But Dr. Meador emphasized again that Petitioner had experienced a typical recovery following the administration of IV steroids, consistent with patients properly diagnosed with TM (despite persistent symptoms of TM she experienced in the ensuing years). *Id.* at 79, 80. And Petitioner's treating physicians never later questioned the initial TM diagnosis. *Id.* at 82. Dr. Meador further maintained that the items of literature he provided (despite many not involving the vaccination at issue or even the same injury) still supported his overall opinion. *See generally Id.* at 87–100.

B.    Respondent's Experts

1.    *Dr. Brian Callaghan*

Dr. Callaghan, a neurologist, prepared two written reports and testified on behalf of Respondent. *See* Report, dated July 25, 2023 (ECF No. 37-1) ("First Callaghan Rep."); Report, dated Jan. 30, 2024 (ECF No. 44-16). Dr. Callaghan opined that Petitioner's medical history and overall clinical course are more consistent with a diagnosis of spinal cord injury rather than that of TM. First Callaghan Rep. at 8.

Dr. Callaghan attended the University of Michigan for his undergraduate degree, and the University of Pennsylvania Medical Center for his medical degree. Curriculum Vitae filed Aug. 7, 2023 (ECF No. 37-8) ("Callaghan CV"). He then completed an internship in Preliminary Medicine and a residency in Neurology at the University of Pennsylvania Medical Center, followed by a fellowship in Neuromuscular at the University of Michigan Health System. *Id.*; Tr. at 109. He currently is an Associate Professor of Neurology, as well as the Fovette E. Duch Early Career Professor at the University of Michigan. Callaghan CV at 1. Dr. Callaghan also serves as Co-Director of the Neuromuscular Division and Associate Program Director for Research at the University of Michigan Health Systems, and the Director of the ALS Clinic at VA Ann Arbor

14

Health System. *Id.* at 2. Within his clinical practice, he has encountered and treated approximately 30 patients with cervical myelopathy per year. First Callaghan Rep. at 1. Dr. Callaghan is board certified by the American Board of Psychiatry and Neurology. Callaghan CV at 1; Tr. at 110.

Dr. Callaghan began his testimony with a brief overview of Petitioner's relevant medical course. He defined TM as an "inflammatory condition of the spinal cord that causes symptoms such as weakness, numbness, tingling, and bowel and bladder issues." Tr. at 113. TM is typically diagnosed via a combination of clinical evidence from the individual's medical history and physical examination, supplemented by various testing, such as MRIs and LPs intended to reveal the presence of inflammation in and around the spinal cord. *Id.* While Dr. Callaghan stated further that TM can oftentimes cause a Brown-Sequard localization, he also maintained that many other spinal cord injuries can have the same result. *Id.*

Based on his review of the overall record, however, Dr. Callaghan concluded that Petitioner did not have TM. Tr. at 114. First, he argued that TM is a monophasic disorder, but here the medical records documented at least "five different times where there was progression or new symptomatology after April of 2019." *Id.* Second (and the most important factor according to Dr. Callaghan), Petitioner's MRIs were all unremarkable. Of note, he highlighted the fact that Petitioner underwent four MRIS of the thoracic spine, five of the cervical spine, three of the lumbar spine, and six of the brain, in the period from April 2019 to the spring of 2023 - all of which produced normal results, an outcome highly atypical if TM were the proper diagnosis. *Id.* at 115. Lastly, Dr. Callaghan maintained that the medical records did not document any other signs of inflammation in the spinal cord, whether evidenced by an MRI with gadolinium enhancement, proof of CSF pleocytosis, or an elevated IgG index. *Id.*

Dr. Callaghan admitted that a TM diagnosis might be proper despite a normal MRI result, and that a positive MRI is not a *per se* diagnostic requirement, with approximately five to ten percent of cases involving normal MRI findings. Tr. at 118. But he opined that such circumstances would be more common in individuals presenting with less severe symptoms, and it was therefore "distinctly unusual" for imaging not to confirm the diagnosis. *Id.* at 115, 118. Here, Petitioner had undergone multiple MRIs throughout her treatment course for the purpose of follow-up, as well as in response to progressive or new symptoms, yet *none* ever supported the TM diagnosis. *Id.* at 117. Those records also revealed progressive or new symptoms—making it "highly unlikely that this is a case of [TM]", according to Dr. Callaghan. *Id.* at 119. And Dr. Callaghan was not persuaded by Dr. Meador's arguments about the effect of steroid medications on Petitioner's test results, noting that while "steroids can impact the yield of MRIs [and CSF findings], usually subtly," the dosage she had received was not likely to have had that kind of impact. *Id.* at 121, 123.

Another factor militating against the TM diagnosis, Dr. Callaghan argued, was the lack of medical record evidence of the expected TM course progression. TM is understood to be a monophasic condition, meaning the timeframe from onset to nadir takes place over a matter of hours to days, usually thereafter followed by improvement. Tr. at 125. Although some patients

15

may later experience new or persistent/progressive symptoms, evidence of other CNS symptoms in conjunction with TM are uncommon. But here, the record established a lingering condition punctuated by a number of new symptomatic features. For example, in June 2020 (more than a year after onset) Petitioner reported increasing weakness in her right lower extremity, as well as a new complaint of numbness from the left side of her chest down to her foot. *Id.* at 126. In addition, she complained of dizziness, head pain, right facial numbness, and blurring of her peripheral vision in March 2023, prompting an extensive workup and additional imaging—all of which produced normal findings. *Id.* Petitioner was later diagnosed with rotary nystagmus[8] in April 2023, and complained of expressive aphasia in October 2024—inconsistent with TM that had occurred five years before. *Id.* at 126–27.

In response to Dr. Meador's assertion that Petitioner's report of increasing lower extremity weakness in June 2020 reflected a TM recurrence, Dr. Callaghan argued that a recurrence would typically require a clear precipitator (like an infection), and that symptoms would get only slightly worse. Tr. at 128. But an individual would not develop *new* symptoms in the case of recurrence, whereas that had occurred in this instance. And here, Dr. Callaghan emphasized the events of March 2023 (i.e., Petitioner's reports of new onset of dizziness, headache, right facial numbness and blurred vision) as clearly reflecting new symptoms distinguishable from her prior TM. *Id.* at 129.

Dr. Callaghan then briefly discussed some of the items of literature cited by Dr. Meador that he argued demonstrated an association between the Tdap vaccine and TM. Tr. at 134. In Dr. Callaghan's view, most of that literature did not pertain to any of the Tdap vaccine's components, or were case reports that stood as weak evidence of causation. *Id.* One article, for example, identified approximately 4,000 individuals with an International Classification of Disease code consistent with TM, but confirmed the diagnosis in only one fourth of that sample (comparable to the fact here that the diagnosis of TM did not fit the medical evidence). *Id.* at 136; J.R. Abbatemarco, et al., *Modern Look at Transverse Myelitis and Inflammatory Myelopathy: Epidemiology of the National Veterans Health Administration Population*, 8 Neurol Neuroimmunol. Neuroinflamm. 1, 5 (2021), filed as Ex. 67 (ECF No. 41-2) ("Abbatemarco"). And of the confirmed TM cases identified in Abbatemarco, only 3.3% had received a vaccination prior to developing TM. Abbatemarco at 5. More importantly, Dr. Callaghan emphasized that Abbatemarco only included cases where TM was clearly diagnosed, and "the authors reasoned that clinician confusion about TM diagnosis was responsible for the excess of patients (4,084 total) receiving an Internal Classification of Diseases (ICD) code for TM." *Id.*; Supp. Callaghan Rep. at 3.

---

[8] "Nystagmus" is defined as "an involuntary, rapid, rhythmic movement of the eyeball, which may be horizontal, vertical, rotatory, or mixed, i.e., of two varieties." *Nystagmus*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=34565&searchterm=nystagmus (last visited June 5, 2026).

Similarly, studies involving the COVID-19 vaccine were of little relevance to the case herein, and otherwise undermined an association even between that distinguishable vaccine and TM. Tr. at 138; *see also* J. Walker et al., *Safety of COVID-19 Vaccination and Acute Neurological Events  A Self-Controlled Case Series in England Using the OpenSAFELY Platform*, 40 Vaccine 4479, 4482 (2022), filed as Ex. A-3 (ECF No. 37-4) (finding "no clear evidence of an increased incidence of transverse myelitis in the primary analysis"); X. Li, et al., *Association between COVID-19 Vaccination, SARS-CoV-2 Infection, and Risk of Immune Mediated Neurological Events: Population Based Cohort and Self-Controlled Case Series Analysis*, 376 BMJ 1, 9 (2021), filed as Ex. A-4 (ECF No. 37-5) (observing no safety signal between COVID-19 vaccines and the immune mediated neurological events of Bell's palsy, encephalomyelitis, Guillain-Barré syndrome, and TM).

### 2.    *Dr. Robert Fujinami*

Dr. Fujinami is a renowned immunologist, and he prepared one written report and testified on behalf of Respondent. *See* Report, Feb. 9, 2024 (ECF No. 44-1) ("Fujinami Rep."). Dr. Fujinami opined that there is a lack of preponderant evidence supporting the assertion that Petitioner's receipt of the Tdap vaccine more likely than not caused her TM. Fujinami Rep. at 10.

Dr. Fujinami holds a Ph.D. in immunology from Northwestern University, where he studied how autoimmune neuroinflammatory demyelinating disease can be initiated in neonates. Fujinami Rep. at 1; Curriculum Vitae, filed as Ex. D (ECF No. 44-15) ("Fujinami CV"). He pursued his postdoctoral training at The Scripps Research Institute, advancing to Assistant Professor and investigating how viruses/infections could induce autoimmune disease. Fujinami Rep. at 1. He was a pioneer of the concept of molecular mimicry, and helped introduce the concept to the medical field. *Id.* Dr. Fujinami has also served as an Associate Professor in the University of California, San Diego's Department of Pathology and studied viruses as triggers for autoimmune disease. *Id.* Thereafter, he was recruited to the University of Utah as professor in the Department of Neurology, and has since moved to the Department of Pathology as Professor, with an Adjunct Professorship in the Department of Neurology. *Id.* Dr. Fujinami continues to investigate viral-host interactions that can lead to nervous system disease. *Id.* (Dr. Fujinami is not, however, a medical doctor or neurologic specialist).

Dr. Fujinami opined that Petitioner's receipt of the Tdap vaccine "was not causative" of her alleged injury. Tr. at 176. He based that view in part on his disagreement with Dr. Meador as to possible autoimmune mechanisms for TM. In considering how an autoimmune condition could occur via molecular mimicry, for example, Dr. Fujinami noted the need for some baseline evidence that an association between an environmental factor and the underlying autoimmune condition existed. But here, he was aware of no data demonstrating a strong link between the analog wild infectious elements of the Tdap vaccine (tetanus, diphtheria, and pertussis) and TM. In addition, no autoantigen had been identified as the putative immune source of attack within the spinal cord.

*Id.* at 179, 180. Moreover, Dr. Fujinami contended that no evidence had been offered showing that antibodies derived from individuals immunized with the Tdap vaccine can even bind to spinal cord tissue. *Id.* at 180. And Dr. Meador had failed to identify any homology between a component of the Tdap vaccine and anything in the spinal cord sheath that (due to the similarity) could result in an immune system mistaken cross-reactive attack on nerve tissues. *Id.* at 181, 182.

In criticizing the likelihood of molecular mimicry as a mechanism capable of driving vaccine-instigated TM, Dr. Fujinami stressed the difference between infections and vaccinations in their respective impacts on the human immune system. He referenced two animal studies, both of which established that molecular mimics having shared amino acids with disease inducing regions were capable of inducing neuroinflammatory disease in the context of *infection,* but not when the subjects were simply inoculated directly with the mimics. Tr. at 183–84; J. Croxford et al., *Viral Delivery of an Epitope from Haemophilus influenzae Induces Central Nervous System Autoimmune Disease by Molecular Mimicry*, 174 J Immunol 907, 907–08 (2005), filed as Ex. C-3 (ECF No. 44-4) (inoculation of mice with the mimic-containing virus led to animals developing disease, whereas vaccinating mice with the molecular mimic peptide alone did not result in neuroinflammation/disease); J. Croxford, et al., *Initiation and Exacerbation of Autoimmune demyelination of the Central Nervous System via Virus-Induced Molecular Mimicry: Implications for the Pathogenesis of Multiple Sclerosis*, 79 J. of Virology 8581, 8582 (2005), filed as Ex. C-4 (ECF No. 44-5) (demonstrating that autoreactive T cells triggered by *infection-induced* molecular mimicry can both initiate and exacerbate clinical autoimmune demyelination).

Bystander activation was also not, in Dr. Fujinami's opinion, likely to mechanistically explain how the Tdap vaccine could spark an autoimmune process leading to TM. Tr. at 185. Bystander activation occurs when "immune system cells that were previously suppressed, or anergic, are broken down by an existing/ongoing immune response to infection (or an autoimmune response to vaccination), causing immune tolerance created by those cells to similarly be destroyed and thereby allowing the dysregulation of the immune response to continue or expand." *See Lozano v. Sec'y of Health & Hum. Servs.*, No. 15-369V, 2017 WL 3811124, at *4, n.6 (Fed. Cl. Spec. Mstr. Aug. 4, 2017), *mot. for review den'd*, 958 F.3d 1363 (Fed. Cir. 2020). But Siegrist (which Petitioner filed) suggested that stimulation of immune cells in this manner would not *produce* pathogenic antibodies that would later go on to attack either oligodendrocytes or axons within the spinal cord, as would be required for a vaccine to lead to TM. Tr. at 186–87; Siegrist at 15.

By contrast, an article relied upon by Dr. Fujinami undermined the view that generalized immune cell activation could spark an autoimmune process (even if it could be the *subsequent* part of an ongoing inflammatory process). Tr. at 189; K. Murali-Krishna, et al., *Counting Antigen-Specific CD8 T Cells: A Reevaluation of Bystander Activation during Viral Infection*, 8 Immunity 177 (1998), filed as Ex. C-11 (ECF No. 44-12) ("Murali-Krishna"). Murali-Krishna's authors, Dr. Fujinami contended, had provided "definitive evidence that the majority of the CD8 T cells responding to a viral infection are antigen specific." Tr. at 189; Murali-Krishna at 185. In other

18

words, Dr. Fujinami explained, a nonspecific aberrant immune process like bystander activation was not also responsible for the initial process that was, in this case, posited to begin with exposure to a vaccine's antigens, but secondary to an ongoing aberrant immune process. Tr. at 189.

Dr. Fujinami next responded to Dr. Meador's assertion that increased production of the IL-6 cytokine may be implicated in how the Tdap vaccine can cause TM. He explained that "generally IL-6 is [not] going to drive proliferation of T cell or B cells[,] [so] there [is] some sort of disconnect between [ ] IL-6 produced in what [is] call[ed] the periphery outside of the central nervous system and IL-6 being produced inside the central nervous system. Tr. at 192. Dr. Fujinami also reiterated his opinion that Dr. Meador failed to provide any reliable evidence demonstrating that the Tdap vaccine can cause TM, and further criticized his reliance on case reports or studies involving different vaccines and/or injuries. Tr. at 202, 203.

## III.   Procedural History

The matter was initiated in December 2021. After activation from "pre-assignment review" (to evaluate if sufficient records were filed to adjudicate the claim), Respondent in the fall of 2022 filed his Rule 4(c) Report opposing entitlement. The parties thereafter began the process of obtaining and filing expert reports from the aforementioned professionals. When expert discovery was completed in May 2024, I set a schedule for trial of the matter in April 2025. After completion of the trial, the parties offered post-trial briefs in September 2025, making the matter ripe for resolution.

## IV.   Applicable Legal Standards

### A.   *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[9] There is no Table claim for TM after receipt of any covered vaccine, including the Tdap vaccine.

---

[9] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

19

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. V. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Distinguishing between "preponderant evidence" and "medical certainty" is important because special masters must take care not to impose an evidentiary burden that is too high. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed.Cir.1991) ("The standard of proof required by the [Vaccine] Act is simple preponderance of evidence; not scientific

20

certainty.... [I]t is not plaintiff's burden to disprove every possible ground of causation suggested by defendant nor must the findings of the court meet the standards of the laboratorian.") (citations and internal quotation marks omitted).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1122 (Fed. Cir. 2025); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Demore v. Sec'y of Health & Hum. Servs.*, No. 20-1265V, 2024 WL 4542934 (Fed. Cl. Spec. Mstr. Sept. 26, 2024), *aff'd*, No. 20-1265V, 2025 WL 868902, at *4 (Fed. Cl. Mar. 20, 2025) (rejecting the argument that a petitioner's burden is to prove that a causation theory is *plausible* and instead requiring petitioner to prove the theory by a preponderance of the evidence) (emphasis added). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the

21

opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *De Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. Den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

### B.    *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11I(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95

22

Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras*, 993 F.2d at 1525 ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony— especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and

23

compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C.      *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88

Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.    *Consideration of Medical Literature*

Both parties filed medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

**ANALYSIS**

**I.  Treatment of Transverse Myelitis in Vaccine Program**

As the parties' experts agreed, TM is a rare, neuro-immune disorder involving focal inflammation within the spinal cord. S. Lim et al., *Transverse Myelitis after Measles and Rubella*

25

*Vaccination*, 40 J. Paediatr. Child Health 583, 582 (2004), filed as Ex. 45 (ECF No. 33-7). Its symptoms and presentation can vary, but generally it involves fast/sudden onset of weakness, sensory alterations, and bowel or bladder dysfunction. Agmon-Levin at 1197. TM's etiology is varied, and while it has been associated with various infectious or systemic autoimmune diseases, it often is deemed idiopathic in origin. *Id.*; Borchers at 231. In fact, as I noted in another recent case involving TM, it may be that TM is a somewhat-overbroad diagnostic classification, including conditions that impact the spinal cord but do not involve actual inflammation, or where TM is merely the presenting symptom of a different illness, like MS. *Henningsen v. Sec'y of Health & Hum. Servs.*, No. 21-1101V, slip. op. at 42 (Fed. Cl. Spec. Mstr. May 8, 2026).

MRI findings usually help treaters confirm the existence of TM. While initial imaging results may not strongly establish TM's presence, they should be somewhat supportive of it (and may often reveal enhancement if contrast is used—evidence of an active inflammatory process sufficient to cause a breach of the blood-brain barrier). Moreover, evidence derived from sequential acts of imaging may later reveal progression as clinical, outward symptoms occurring in real time. *See, e.g.*, *Greenslade v. Sec'y of Health & Hum. Servs.*, No. 14-1140V, 2024 WL 3527665, at *6–7 (Fed. Cl. Spec. Mstr. June 28, 2024) (finding claimant's TM began pre-vaccination, given evidence of prior symptoms; first post-vaccination MRI (performed several weeks after earlier symptoms) revealed mild T2 signal intensity but no enhancement, and then claimant's symptoms continued to present and evolve over the following days).

Importantly, and as Program decisions recognize, TM (when vaccine-associated) typically presents *acutely*. *See, e.g.*, *Handjis v. Sec'y of Health & Hum. Servs.*, No. 18-1044V, 2022 WL 17852426, at *16 (Fed. Cl. Dec. 5, 2022) ("[i]f one were to accept that petitioner received a high dose flu vaccine on December 10, 2015, and presented on December 14, 2015 with symptoms that were ultimately diagnosed as TM and supported by objective testing, then petitioner would have satisfied [*Althen*] Prong III"); *Raymo v. Sec'y of Health & Hum. Servs.*, No. 11-0654V, 2014 WL 1092274, at *10, *19 (Fed. Cl. Spec. Mstr. Feb. 24, 2014) (onset of TM occurred between three to four days after vaccination and was consistent for an immune mediated disorder).

The Program has had varied responses to TM as a vaccine-associated adverse event. Petitioners have succeeded in claims that different covered vaccines can cause TM, including the Tdap vaccine. *See e.g.*, *Le v. Sec'y of Health & Hum. Servs.*, No. 16-1078, 2023 WL 3049203, at *23 (Fed. Cl. Spec. Mstr. Mar. 30, 2023) (finding petitioner provided preponderant evidence that the Tdap vaccine can cause TM via molecular mimicry); *Schmidt v. Sec'y of Health & Human Servs.*, No. 07-20V, 2009 WL 5196169 (Fed. Cl. Spec. Mstr. Dec. 17, 2009) (granting entitlement on a claim that an influenza vaccine caused Petitioner's TM via molecular mimicry). However, as with any case, the specific factors of an individual vaccinee's medical history can impact a claim's success, even when the causal theory finds favor. *See, e.g.*, *Palattao v. Sec'y of Health & Hum. Servs.*, No. 13-591V, 2019 WL 989380 (Fed. Cl. Spec. Mstr. Feb. 4, 2019) (denying entitlement

in TM case where petitioners failed to establish that timing of onset of symptoms was medically appropriate under their proposed causation theory).

My own decisions demonstrate more of a willingness to accept that some vaccines can be causal of TM than others. *Compare J.S. v. Sec'y of Health & Hum. Servs.*, No. 14-851V, 2018 WL 11731139 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (flu vaccine demonstrated to be causal of TM) *with Curry v. Sec'y of Health & Hum. Servs.*, No. 22-729V, 2025 WL 1693655 (Fed. Cl. Spec. Mstr. Apr. 28, 2025) (denying entitlement where petitioner alleged Tdap vaccine caused him to suffer TM). As often as not, resolution of the matter has turned on the second or third *Althen* prongs— whether the totality of evidence suggests the vaccine likely did cause a person's TM, and/or whether it began in a medically-acceptable timeframe, measured from date of vaccination. *See Lloyd v. Sec'y of Health & Hum. Servs.*, No. 21-1332V, 2025 WL 3002617 (Fed. Cl. Spec. Mstr. Sept. 29, 2025); *Ross v. Sec'y of Health & Hum. Servs.*, No. 22-136V, 2025 WL 3531575 (Fed. Cl. Spec. Mstr. Nov. 14, 2025).

## II.  Petitioner Did not Likely Experience TM

As a threshold matter, a Vaccine Act claimant must establish she suffers from the condition for which she seeks compensation. *Broekelschen*, 618 F.3d at 1346. "The function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner's] injury.'" *Andreu*, 569 F.3d at 1382 (quoting *Knudsen*, 35 F.3d at 549). "Although the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury—the Act specifically creates a claim for compensation for "vaccine-related injury or death.'" *Stillwell v. Sec'y of Health & Hum. Servs.*, 118 Fed. Cl. 47, 56 (2014) (quoting 42 U.S.C. § 300aa-11(c)). Accordingly, the Federal Circuit has concluded that it is "appropriate for the special master to first determine what injury, if any, [is] supported by the evidence presented in the record" before applying a causation analysis pursuant to *Althen*, 418 F.3d at 1274. *Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d at 1343, 1351–53 (Fed. Cir. 2011). Resolving the issue of what diagnosis has the most record support can impact whether causation can even be established.

The overall medical record evidence in this case preponderates against a TM diagnosis, despite treaters' initial thoughts (and regardless of the fact that TM was carried through Petitioner's records over the course of her treatment as her diagnosis). First, Petitioner's had a pre-existing history of RLS—of which she was diagnosed with in 2017. Although Dr. Meador argued that "RLS does not cause TM and the temporal disassociation with TM event make these two conditions unrelated in [Petitioner's] case," (First Meador Rep. at 7) he provided no additional evidence supporting his assertion that the conditions are unrelated, or why some consideration should not in this case be given to this overlapping comorbid condition. Indeed, Petitioner was

reporting RLS symptoms the day she received the Tdap vaccine in question. Ex. 2 at 174–75, 177–79, 201.

Second, the fact that Petitioner's illness was not monophasic provides additional evidence undermining the conclusion that she likely experienced TM. Over the course of Petitioner's treatment and follow-up, the records indicate that she complained of numbness from her left chest down, dizziness, right facial numbness, or rather visual problems. *See* Ex. 15 at 20; Ex. 38 at 15–16, 56, 48–49, 87, 90, 94–99. Dr. Meador reasoned that such symptoms were recrudescence of her old spinal cord injury, but Dr. Callaghan more persuasively argued that this evidenced *new* symptoms not commonly suspected in someone with TM. There is also the fact that Petitioner was treated with IV Solu-Medrol, a potent corticosteroid, during her initial hospitalization, and she did not have significant improvement in her symptoms. Steroid treatment for individuals with acute TM is understood to be the standard of care and is expected to lead to significant improvement. Here, however, Dr. Callaghan emphasized that this was not the case for Petitioner. *See* Tr. at 127.

Lastly, and especially significant, is the fact that both CSF and MRI test results did not corroborate the existence of spinal cord inflammation, either at the time of Petitioner's early-April presentation or even later. Over several years, Petitioner underwent numerous MRIs at various points throughout her treatment course, yet there was never any indication of spinal cord lesions, inflammation, demyelination, or other abnormalities commonly seen in TM. *See, e.g.*, Ex. 3 at 119–20 (Apr. 1, 2019 brain MRI), 214–17 (Apr. 1, 2019 lumbar, thoracic, and spinal cord MRIs), 219–22 (Apr. 4, 2019 thoracic and cervical spine MRIs), 406–07 (Oct. 1, 2019 cervical spine MRI), 444–45 (Oct. 7, 2019 lumbar spine MRI), 425–46, 479 (Oct. 7, 2019 thoracic spine MRI). Medical literature shows that over ninety percent of individuals with TM have abnormal MRIs. First Callaghan Rep. at 7. Similarly, Petitioner's CSF testing failed to show any significant findings, such as pleocytosis or an elevated IgG index. Pursuant to the Transverse Myelitis Consortium Working Group's proposed diagnostic criteria for TM evidence of "[i]nflammation within the spinal cord demonstrated by CSF pleocytosis *or* elevated IgG index *or* gadolinium enhancement" is required for a diagnosis of acute TM. *Proposed Diagnostic Criteria and Nosology of Acute Transverse Myelitis*, 59 Neurology 499, 500, Table 1 (2002), filed as Ex. 73 (ECF No. 49-1).

Dr. Meador did reasonably note that TM is not definitively established by MRI results in every case. But this kind of testing would corroborate TM—if not immediately at the time of a patient's presentation, then somewhat later. Here, that corroboration was never provided. It thus has not been preponderantly established that Petitioner likely experienced TM.

## III.    Petitioner Has Not Met Her *Althen* Burden of Proof

It is well-accepted in the Vaccine Program that (because claimants must preponderantly establish all three Althen prongs to receive damages) special masters need only evaluate those causation elements relevant to a denial of entitlement. *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 Fed. Appx. 976, 980 (Fed. Cir. 2014). Here, I find the first Althen prong has not been satisfied, and this is a sufficient basis alone for denial of entitlement.

Dr. Meador's theory of causation was thin and inadequately substantiated. He could not offer any direct proof implicating the Tdap vaccine or its wild infectious cognate components with TM. This is certainly *not* an insurmountable obstacle to proving causation, since Program claimants may meet their preponderant standard with a combination of indirect and circumstantial pieces of evidence, and are not required to marshal direct proof. But it underscores the baseline difficulty he faced in advancing a persuasive causation theory. At most, he referenced some case reports specific to TM and Tdap identified in Agmon-Levin (or Peng, which Agmon-Levin referenced), but this is a very weak form of causation evidence. *Caves v. Sec'y of Health & Hum. Servs.*, No. 07-443V, 2010 WL 5557542, at *14 (Fed. Cl. Spec. Mstr. Nov. 29, 2010) ("case reports do[] not help [petitioners] meet [their] burden of demonstrating a persuasive and reliable theory causally connecting" vaccine to injury), *mot. for review den'd*, 100 Fed Cl. 119 (2011), *aff'd*, 463 F. App'x 932 (Fed. Cir. 2012). And I have in other cases criticized reliance on Agmon-Levin, which strains to show a vaccine association with TM based on many years of data. *I.J. v. Sec'y of Health & Hum. Servs.*, No. 16-864V, 2022 WL 277555 (Fed. Cl. Spec. Mstr. Jan. 4, 2022) (stating Agmon-Levin, an oft-criticized review article summarizing a number of case reports, is not persuasive evidence and that it offers limited support as it referenced only four instances of post-Tdap-comparable TM).

Dr. Meador invoked two possible autoimmune mechanisms, but neither were shown to be likely applicable in this context. Molecular mimicry, for example, is a reliable theory for how some autoimmune disease processes "work," and could also apply to TM specifically. But as Dr. Fujinami noted, Petitioner failed to provide evidence of what aspects of the Tdap vaccine were mimics of nerve protein or other components that could cross-react, as well as what autoantibodies were likely to be produced due to vaccination that would drive that reaction (or even that Petitioner was shown to possess them). *Ross v. Sec'y of Health & Hum. Servs.*, No. 22-136V, 2025 WL 3531575, at *20 (Fed. Cl. Spec. Mstr. Nov. 14, 2025) (Tdap vaccine not shown to be causal of TM; claimant did not, among other things, show that she possessed potentially causative autoantibodies). Dr. Meador's reference to bystander activation was even less well-substantiated, as Dr. Fujinami persuasively demonstrated that this autoimmune mechanism is likely a secondary means of propagating an existing process—not something that would be triggered by vaccination or instigate an autoimmune disease on its own.

29

Dr. Meador's argument about the role of cytokines was also unavailing. While vaccines like Tdap may cause transient increases in cytokine levels, this does not lead to the conclusion that this *expected* impact of immunization produces a pathogenic process. *M.R. v. Sec'y of Health & Hum. Servs.*, No. 16-1024V, 2023 WL 4936727, at *32 (Fed. Cl. Spec. Mstr. June 30, 2023) ("[t]he presence of increased cytokines alone in a post-vaccine environment does not inherently mean pathology, no matter the reliable nature of speculation to that end"). And it was not demonstrated that upregulation of cytokines leads to TM, as opposed to the equally-likely prospect that greater numbers of these immune messenger cells are likely to be seen in the *context of* the ongoing neuroinflammation that would characterize TM. Plus, Dr. Fujinami correctly noted that IL-6 would not generally spark the production of the kinds of immune cells driving an autoimmune attack on spinal cord myelin, even if the cytokine was otherwise proinflammatory.

Dr. Fujinami, by contrast, persuasively explained why it was not likely the Tdap vaccine can cause TM. Besides observing the overall lack of evidence suggesting the Tdap vaccine is associated with TM (or Tdap's infectious components), he made a compelling point about the difference between the severity of a wild infectious process and the controlled context of a vaccination, observing that literature established an autoimmune process driven by molecular mimicry was simply less likely to occur for the latter. He also provided a convincing basis to disregard bystander activation (or any form of nonspecific immune response) as an autoimmune disease mechanism capable to causing TM after vaccination, since these processes were more likely to occur secondarily to some other aberrant immune stimulation, as opposed to lead a process in proximate reaction to an environmental trigger. I gave greater weight to Dr. Fujinami's opinion, given his widely-accepted expertise[10] on the topics of the immune system and molecular mimicry, over the views of Dr. Meador (whose competence in neurology did not also extend to the same degree to questions of immunology, even if he had sufficient medical qualifications to offer an opinion that addressed causation).

## CONCLUSION

Because Petitioner has not carried her burden of proof, she is not entitled to damages. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[11]

---

[10] Dr. Fujinami is understood in the Vaccine Program to possess deep expertise on the topics of immunology and molecular mimicry as an autoimmune pathogenic driver, as has been recognized even by experts who frequently testify for *petitioners* (but never fail to cite Dr. Fujunami's work). *See, e.g.*, *Strouse v. Sec'y of Health & Hum. Servs.*, No. 19-793V, 2026 WL 825706, at *7 (Fed. Cl. Spec. Mstr. Feb. 20, 2026) (claimant's causation expert citing Dr. Fujinami's work in support of reliability of molecular mimicry as autoimmune mechanism); *Morrison v. Sec'y of Health & Hum. Servs.*, No. 18-386V, 2024 WL 3738934, at *7 (Fed. Cl. Spec. Mstr. July 18, 2024) (same, and same expert); *Anderson v. Sec'y of Health & Hum. Servs.*, No. 18-484V, 2024 WL 557052, at *17 (Fed. Cl. Spec. Mstr. Jan. 17, 2024) (same, and same expert).

[11] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master
